No. 3807

**Second Circuit**

——

SEXTON v. STILES

——

(November 7, 1930.  Opinion and Decree.)
(December 23, 1930.  Rehearing Refused.)
(January 2, 1931.  Writ of Certiorari and
Review Refused by Supreme Court.)

——

Cook & Cook and Atkins & Meadors, of Shreveport, attorneys for plaintiff, appellee.

Blanchard, Goldstein, Walker & O'Quin, of Shreveport, attorneys for defendant, appellant.

DREW, J. Plaintiff instituted this suit, alleging that approximately two and one-half miles west of Homer, Claiborne parish, Louisiana, on what is known as the Homer Oil Fields Road, said road goes up the rise of one hill, down the other side, and up another hill; that at approximately 6:45 p. m. on November 11, 1928, a light truck loaded with hay belonging to defendant J. E. Stiles, was left parked in the approximate center of said road, the truck facing towards the oil fields approximately thirty or forty feet up the rise of the second hill; that one layer of hay was placed in the bed of the truck, and between the first layer of hay and the remainder of the hay in the truck three skinned wooden poles had been loaded, the poles projecting from the rear of the truck approximately six or seven feet in the direction of Homer, and that one of the poles projecting six or seven feet had worked around so that it projected at an angle of some thirty or forty degrees from the bed of the truck to the left of the rear of said truck, the end of the pole projecting out into the approximate center of the path of any car seeking to pass the truck.

He further alleges that at 6:45 p. m. on November 11, 1928, it was good dark and that said truck had no lights, either front or rear, nor did it have any danger signal of any character whatsoever on the truck or poles, nor was the truck equipped with either front or rear lights.

He further alleges that said truck had been operated by and was in charge of a negro employee by the name of Dennis Richardson, in the employ of J. E. Stiles, who, at the time of the accident, was engaged within the scope of this employment, and that said truck was left unattended in the approximate center of the said road, without any danger signals of any kind whatsoever, designed or intended to notify any person traveling said road of the dangerous character of said obstruction.

He further alleges that at approximately 6:45 p. m. on that day he, the plaintiff, in a Pontiac sedan, was traveling at a moderate rate of speed, operating same in a careful and prudent manner, observing all the rules of traffic, upon the road above described, from Homer, Louisiana, to the Homer Oil Fields, west of said town; that it was dark at the time, and plaintiff had put on his lights on his car

prior to reaching Homer and had the lights on his car burning at the time he reached the location of the parked truck; that in descending the hill situated just to the rear of the location of said truck the truck was not visible to plaintiff and only became visible as he reached the bottom of said hill and began to take the rise of the hill upon the side of which the truck was parked, and that the truck became visible to plaintiff only when his car was approximately twenty feet from the rear of said truck; and that in order to avoid running directly into the rear of the truck he swerved his car to the left, to pass the truck on the left side, and would have passed the truck without a collision had it not been for the pole heretofore described projecting in an angular direction from the rear of said truck, directly in his path. That the pole was a white wood, freshly skinned pole, and was not visible to plaintiff as he approached the truck.

The car of petitioner came in contact with the end of said pole, the pole entering the car through the right side of the windshield, striking petitioner on the right side of the lower jaw, tearing away his lower jaw and going through and projecting beyond the left door of his car.

He alleges that he was in no way responsible for the collision or the injuries received by him, and that the same were caused solely by the negligence of defendant, through his employee, in placing the dangerous obstruction in the road.

Plaintiff then alleges the damages he sustained by reason of the accident, itemizing them as follows:

| | |
|---|---|
| Disfigurement and personal injury to face and body | $30,000.00 |
| Pain and suffering | 25,000.00 |
| Doctors' bills | 915.00 |
| Nurses' bills | 188.25 |
| Hospital expenses | 792.25 |
| Traveling expenses to and from hospital | 200.00 |
| Cost of repairs to automobile | 30.00 |
| Loss of one-half of 8 months' earnings | 563.00 |
| Loss of 12 months' earnings (estimated) | 1,959.00 |
| Hospital bills, nurses' bills, doctors' bills, and expenses incident to necessary operations yet to be performed (estimated) | 2,500.00 |
| Total | $62,147.50 |

He prays for a trial by jury, alleges that the defendant, J. E. Stiles, should be made to repair the damages, and prays for judgment against him in the amount set forth above by items.

Defendant filed an exception of no cause of action, which was overruled by the lower court, and it is not urged here.

Defendant answered, denying the principal allegations of plaintiff's petition. He admits that there are small hills at the point described by plaintiff. He alleges that at about 4 o'clock p. m., on November 11, 1928, one of his trucks, loaded with hay and then being operated by a competent and careful driver, stopped at about the lowest point between the hills described when, through no fault of defendant or his employee, the universal joint of the truck was broken; that the truck could not be operated in its then condition, and the driver, acting prudently, placed the truck as near the outside of the road as possible, and started immediately on foot to a camp of defendant, where defendant kept mule teams, located about a mile and a half distant from

where he left the truck, to secure a team of mules to remove the truck and hay; and that because the accident occurred on a holiday defendant's employees usually at the camp were absent, and defendant's driver was unexpectedly and unavoidably delayed in securing a team and returning to the truck, reaching it just prior to or about dark.

Defendant admits that the poles had been loaded as described, but specially denies that they projected from six to seven feet from the rear of the truck; he denies that the truck was not equipped with lights; and alleges that under the circumstances described, it was unnecessary and inadvisable to have left the lights of the truck burning when his employee started out for assistance, and that the delay in his return was unavoidable.

Defendant denies that the situation of the small hills described could have in any way obstructed plaintiff's view and shows that if plaintiff did not see the truck long before reaching it, the cause was his own fault or negligence. He alleges that the front of plaintiff's car actually collided with the rear of the truck. He admits that the poles were white and freshly peeled. He alleges that plaintiff's car was run practically full into the rear of defendant's truck and alleges that the sole cause of the accident was the negligence of plaintiff in the following particulars:

(a) That plaintiff's eyesight was so defective and he was so near-sighted that he was totally incapacitated to drive an automobile; and that for him to do so under any circumstances was highly negligent and reckless;

(b) That plaintiff had that day driven from Hattiesburg, Mississippi, was tired, and, consequently, was paying little attention to his task; and

(c) That the lights of the car were not properly functioning.

Further, and in the alternative, defendant alleges that if he was negligent to any extent, the proximate cause of plaintiff's injury was his contributory negligence in the respects hereinabove pointed out, and that a reasonably competent driver, acting as a prudent person should, would have seen the truck long before the collision occurred, and could and should have avoided it. He prays for the demands of plaintiff to be rejected.

The case was tried before a jury in the lower court and resulted in a judgment for the plaintiff in the sum of $33,367.50. From this judgment, defendant has appealed and plaintiff has answered the appeal praying that the judgment be amended by increasing the amount to the sum of $59,647.50. The facts in the case, as shown by the evidence, are as follows:

The truck driven by Dennis Richardson was owned by the defendant, and the driver was in the employ of defendant and had charge of the truck at the time of the accident and was acting within the scope of his employment. On the morning of November 11, 1928, the truck was loaded with hay and three peeled poles at defendant's camp, at Smackover, Arkansas. The truck was an ordinary Chevrolet one-ton truck. The destination of the truck was one and one-half miles west of the place of the accident, this being another camp of defendant. The truck was loaded in the following manner: two bales of hay were standing on end, between the outside of the frame of the truck and the poles, then the hay was laid lengthwise between

the bed and the center, and then the hay loaded crosswise. The back ends of the poles were elevated over the second plank in the back end of the truck and the front ends of the poles were jammed against the front end of the truck bed. Two poles were on one side of the truck and one on the other. On each side, the poles were the distance of the width of a bale of hay from the side of the truck. The bed of the truck was wide enough to carry four bales of hay. From the left side of the truck at the rear there was the frame of the truck, then a bale of hay standing on end, then a pair of poles, then two bales of hay and another pole, then a bale of hay standing on end and the frame of the bed of the truck or right side of bed of the truck. The poles were jammed against the front of the bed of the truck at the bottom of the truck and elevated at the back of the truck to about twelve or eighteen inches. The bed of the truck was eight and one-half feet long and the longest pole was twelve feet long, the other two poles being eleven feet, eleven inches and eleven feet, ten inches, respectively. Therefore, when they were loaded, the longest pole extended over the back of the truck not quite three and one-half feet. When the truck arrived at Homer, approximately two and one-half miles east of the scene of the accident, the poles were in the same position as when they were loaded and when the truck left Smackover, a distance of more than sixty miles. The facts as stated up to this point are uncontradicted.

When the truck arrived at the hill, just east of the scene of the accident, hereafter spoken of as the "East Hill," the driver heard a popping of the universal joint. He coasted down this hill and, on reaching the bottom of the decline, threw his truck in gear, at which place the universal joint broke and locked the car. Being unable to move the car with its own power, he therefore left it in the road and went to the camp of defendant about one and one-half miles distant, to secure a team to pull the truck in with. On arriving at the camp, he found no one present, and had much difficulty in catching and harnessing a team of mules. When he finally succeeded in getting the mules harnessed and returned to the truck, it was after dark and after the accident had happened. When the driver of the truck left it in the road, it was about 4 o'clock in the afternoon. The day was a bright sunshiny day, and it is admitted that the sun set at 5:19 o'clock on that evening. Ordinarily, he would have had time to secure the team of mules and return to the truck before night. When the driver left the truck he did not turn on the lights in front or rear nor did he place on said truck in front or rear any sign or warning to other persons traveling that road.

After the accident, the mules were hitched to the truck, but were unable to pull it until after it had been unloaded, then the truck was pulled in to defendant's camp and the hay carried in on a wagon.

The evidence clearly shows that the truck was left in the valley between the two hills to the west of the lowest point in the valley, approximately fifty or sixty feet west of the lowest point; that the front end of the truck was near the right side of the road in the direction it was going, approximately three or four feet from the right edge of the road, and the rear end of the truck was angling towards the center of the road; the rear end of the truck being approximately to the center of the road; that the road was twenty-

four feet wide, that it had a crown of twenty-four feet and was graveled; and the preponderance of the testimony of the witnesses who saw the truck prior to the accident is that the poles were sticking straight out the back of the truck, not exceeding four feet. The angle in which the truck was placed caused the poles to extend slightly over the center of the road.

There is much evidence in the record as to the location of the car and truck after the accident and as to the distance the pole was projecting out of the truck after the accident, which clearly shows that the pole had gone through the windshield and out the left-hand door of plaintiff's car, extending one foot the other side of the door. It is argued that this indicated that the pole was extending more than four feet out the back of the truck. We do not think so. The preponderance of the testimony in regard to the poles before the accident clearly shows that they were not extending out the back of the truck more than four feet, and this is supported strongly by the manner in which they were loaded. The only probable way for the poles to extend farther out the back of the truck than four feet would be for them to be pulled out, which we think happened when the car hit the truck and bounced off to the left. The plaintiff was no doubt attempting to turn to the left as indicated by the position of the car after the accident and the pole was wedged against the windshield on the right and the steering wheel and door on the left, and when the car, with the force it struck, which is shown by the fact that the heavily loaded truck that could not be pulled by a team of mules was slided over to the left from six to eighteen inches, by the impact of the car, either bounced off or careened off to the left, it necessarily pulled the pole with it, causing the pole to then extend out of the truck some six or seven feet.

The least distance any witness gave the clearance on the road to the left of the truck, even after the accident, was from eight to ten feet, that is, on the south side of the road, and we are constrained to believe that the clearance was almost, if not entirely, half of the road, for the reason that it is shown that after the accident the impact had moved the truck over to the center of the road a distance ranging from six inches to one and one-half feet, and after the accident, with the plaintiff's car sitting almost entirely to the left of defendant's truck, other cars passed on that side of the road without having to go into the ditch.

The contour of the road or the grade of the road from the location of the truck east for one hundred fifty to two hundred feet is best shown by the photographs in the record, which were thoroughly identified, as showing the true situation as to the grade of road, etc., as well as the testimony of witnesses who were more familiar with the lay of the land at that place, including Mr. Wideman, who owns and farms the land on both sides of the road at that point. The east hill is not a steep hill, being rather a long, slight decline, while the west hill is rather steep; between the two hills, which is shown to be about 2,000 feet from crest to crest, there is a valley of at least two or three hundred feet which is practically level, slightly rolling to the east. To the naked eye, the incline or decline of this two or three hundred feet stretch of road is hardly noticeable. The evidence is conclusive that the elevation at the point of the truck and the point where the Wideman car was sitting, thirty-nine steps east of the truck,

is practically the same and that the very lowest point in this valley is about middle ways between the location of the Wideman car and the truck.

We have stated that it was a clear, sunshiny day, and that the sun set at 5:19 o'clock. The time of the accident is not definitely fixed and is a point of contest in this case.

Plaintiff alleges that the accident happened at 6:45 p. m. However, he is mistaken as to his time, for that is the exact time the record shows that he entered the sanitarium at Haynesville. After the accident, the plaintiff was unconscious, a car drove up and turned around, plaintiff was removed from his car to the other car and driven to Homer, a distance of approximately two and one-half miles, was taken out of the car and carried upstairs to the doctor's office. The doctor was at supper at his home, at least one-half mile from his office. He was telephoned, and drove to his office and administered first-aid treatment, saw it was a hospital case and telephoned to the sanitarium at Haynesville. Plaintiff was removed from the office and placed in a car and carried to Haynesville, a distance of fourteen miles. He arrived at the sanitarium at Haynesville at 6:45 p. m. Defendant contends that it took at least one hour to do the many things that were done from the time of the accident until plaintiff entered the sanitarium at Haynesville, and we cannot disagree with him much. Certainly the accident did not occur after 6 o'clock and we believe it was between 5:45 and 6 o'clock when it happened. The evidence is very conflicting on the question of the necessity of using lights on the cars at that hour, some witnesses had turned on their lights, others had not. The plaintiff had his lights burning. It was safer to use lights on the cars at that time of day and, while one might have seen without them, it would have been unsafe to drive without lights. One negro witness correctly described the time of day as to light or dark when he said that it was "dusk dark." It was that time of day when daylight is fastly fading and night fastly approaching, and when it is much safer to drive with lights than without. The law requires lights to be used on automobiles at that time of day.

Another controverted point is, did the car actually strike the truck or did it entirely miss the truck and only hit the pole extending back of the truck?

The only witnesses who saw the accident are the plaintiff, his wife and Mrs. Edmonds. Plaintiff and his wife testify that they saw the truck when it was about twenty feet from them, that the car was turned to the left and missed the truck but was struck by the poles; and Mrs. Edmonds, who passed the plaintiff going in the opposite direction just a few seconds before the accident, testifies that she looked back and saw the collision. Mrs. Edmonds could not tell whether the car hit the truck and the poles or just the poles; however, her impression was that the car missed the truck and struck the poles. We do not think the plaintiff and his wife could know whether the car hit the truck or the poles. They think it was struck by the poles. But necessarily, the poles and the truck were struck at about if not exactly the same time and it would be very difficult for them to know just what happened. The undisputed testimony is that the car had a hole several inches in diameter in the cowl, near where the hood breaks in the middle and a little to the right of the

center of the hood, and that the truck was marked with paint of the same color as the car on the corner of the body of the truck at a point that would correspond in height to the hole in the car, and that the bumper of the Sexton car was dented. There was no attempt made to explain the dent on the bumper of the car or the hole in the cowl and the paint of the same color of the car on the truck. These are mute witnesses that, without explanation, are convincing that the car of plaintiff did strike the body of the truck.

Furthermore, the testimony shows that Mrs. Edmonds, on passing the plaintiff, immediately looked back and exclaimed: "That man is going to hit that truck, bound to, he is going straight in it." Then said: "He hit that truck." This was the exclamation of a witness made at the time of the accident and while looking at it. A witness for the plaintiff and used by the plaintiff.

Plaintiff contends that he only saw the truck twenty feet before reaching it, and his wife testifies that he was driving twenty miles per hour. Assuming that to be true, plaintiff had only less than one and one-half seconds in which to dodge the truck after he saw it; and if he was driving at the rate of thirty miles per hour, he only had less than one-half second to dodge the truck after he saw it. In either instance, it was almost a physical impossibility.

There are only two witnesses who attempt to fix the rate of speed that plaintiff was driving; in fact only two that were questioned in regard to the speed. Plaintiff's wife states that he was making twenty miles, and is rather positive in her testimony under cross-examination, although she states that she did not look at the speedometer, and that they had been making from thirty to thirty-five miles all day until after leaving Homer. One other witness testified that plaintiff was driving at a moderate rate of speed, and not so fast.

It is not contended that plaintiff was speeding, and under our finding as to the contour of the road, it is immaterial to the case whether he was making twenty or thirty miles per hour, other than as to the opportunity he had to dodge the truck after seeing it only twenty feet ahead of him.

Plaintiff, with his wife and three small children, left Collins, Mississippi, on the morning of November 11, 1928, at about the hour of 7 o'clock, on his way to his home in the Homer Oil Fields, about five miles west of Homer, in Claiborne parish, Louisiana. He came by the way of Vicksburg, Monroe and Homer. He was driving a Pontiac car. The distance from Collins to Vicksburg is 125 or 130 miles, from Vicksburg to Monroe 100 miles, Monroe to Homer 73 or 74 miles, and from Homer to the scene of the accident about two and one-half miles; making a total of 301 or 307 miles. He lost one hour and fifteen minutes in crossing the ferry at Vicksburg, twenty minutes for lunch at Monroe, time to get gas at Jackson, and stopped for his mail in Homer; all told not less than one hour and fifty minutes, leaving approximately nine hours of actual driving time. He had averaged about thirty-four miles per hour during the day, including the delay in passing through incorporated towns, of which there are quite a number on this route. It is common knowledge that in order to make an average such as was made by the plaintiff on that day he must necessarily have driv-

en forty to forty-five miles per hour when outside of the towns and cities, and there is no good reason given for his slowing down to half speed when nearing home.

When the witness, the only one other than plaintiff's wife, testified that he was driving at a moderate rate of speed "not so fast" we think the court would be justified in saying that thirty miles an hour is a moderate rate of speed, and that plaintiff was making from twenty-five to thirty miles per hour and therefore had not more than one-half second in which to turn so as to miss defendant's truck—a feat almost impossible of performance unless he had known that he was going to see the obstruction when he was within twenty feet of it and was prepared to dodge it within that distance. It is conclusive to our minds that the car of plaintiff did hit the truck of defendant.

Under the facts as above stated is the defendant liable?

Plaintiff contends:

1. That defendant was negligent in leaving the truck parked or standing in the approximate center of the highway at or after dark, it having been practical for him to have placed it to one side.

2. That it was actionable negligence for him to have left the truck in the road at the time of the accident without having displayed on the rear of the same a red light visible for a distance of five hundred feet to the rear.

3. That it was also actionable negligence for the defendant to have upon the road a truck loaded with a projection more than four feet beyond the rear of the bed or body, without displaying a flag in the daytime or a yellow or red light in the

nighttime which would be visible under normal conditions two hundred feet from the rear.

4. That even if leaving the truck standing at dark, and after, without lights or other warning signals, did not constitute negligence, nevertheless leaving the same parked in the center of the road, with a pole six or seven feet projecting beyond the center of the road and beyond the truck was grossly negligent.

The first contention loses its force, due to the fact that the evidence shows that it was not practicable for the truck to have been moved after the universal joint broke and that it was impossible to move it after the accident with a pair of mules until it was unloaded; and for the further reason that the driver is shown to have done his best to get a team and move the truck before the accident.

Contentions three and four lose their force due to our finding that the poles did not extend over the back of the truck more than four feet prior to the accident; and therefore no necessity existed for displaying a flag in the daytime or a light at night on the rear end of the poles.

That brings us to the sole and only remaining contention of plaintiff, which is: Was it actionable negligence for the truck to have been left in the road after the hour for turning on lights on automobiles, under the law of the state, without having displayed on the truck a rear light visible for five hundred feet?

Section 57 of Act No. 296 of 1928 reads as follows:

"Whenever a vehicle is parked or stopped upon a highway whether attended or unattended during the times mentioned in

Section 50 (half hour after sunset to a half hour before sunrise and at any other time when there is not sufficient light to render clearly discernible any person on the highway a distance of 200 feet ahead) there shall be displayed upon such vehicle one or more lamps projecting a white light visible under normal atmospheric conditions from a distance of five hundred feet to the front of such vehicle and projecting a red light visible under like conditions from a distance of five hundred feet to the rear," etc.

We have found that it was near enough night for lights to be required burning on automobiles; therefore it was negligence to leave the truck parked on the highway without lights as described in Section 57 of Act 296 of 1928.

Defendant contends that the driver of the truck left before night and had every reason to expect to return to the truck before dark, and that in not returning, due to the unavoidable delay in catching and harnessing the mules, he acted as any reasonable and prudent man would have done under the circumstances, and that the law requires nothing more. That defense, made to a charge under the criminal law, for parking his car without lights on the highway atfer dark, might have a tendency to mitigate against a heavy sentence, or even to bring a suspended sentence, but it cannot relieve him from liability in a suit for damages, if the lack of lights on the car was the proximate cause of the accident and accompanying injuries. Lights are required to be displayed on automobiles after night when they are parked on the highway, for the purpose of protecting other users of that highway against accidents and collisions, and certainly the misjudgment of defendant's driver, as to when he could get back to the car, or that he would get back to the car before dark, will not excuse him or his employer from liability occasioned by an accident the proximate cause of which was the absence of lights on the parked car.

The courts of this state have uniformly held that it is negligence per se for one to park a car on the highway without lights after dark, when an accident is caused by said failure. However, if the absence of the lights is not the proximate cause of the accident but same is brought about through the carelessness and recklessness and lack of precaution on the part of the one driving into the parked car, then the courts have refused to hold the owner of the parked car liable.

Defendant contends that plaintiff was guilty of actionable negligence, in that he alleged that he could not see more than twenty feet ahead of his car due to the contour of the road, and was driving in excess of fifteen miles per hour, in violation of paragraph (b) of section 5 of title II of Act No. 296 of 1928. Under our finding of fact, it is unnecessary for us to pass on this question. The highway, for at least 150 to 200 feet east of the parked truck, was nearly level, only slightly rolling to the east, and there was no obstruction of any kind to prevent plaintiff seeing the parked truck long before he reached it. Plaintiff testified that he saw the Wideman car when he came over the east hill, a considerable distance before he reached it. It was parked on the opposite side of the road, just thirty-nine steps east of the truck of defendant, and was a coupe; defendant's truck was directly in front of it and was loaded high with hay and should have been much easier to see than the Wideman car sitting on the left side of the road without any lights. The elevation of the road at the Wideman car

and defendant's truck was about the same, and there was certainly no reason for plaintiff not to have seen the truck when even with the Wideman car, which was 115 to 120 feet from the truck.

Just prior to and within fifteen minutes of the accident, it is shown that a number of cars passed the truck going both ways. No one else ran into it. Just a few seconds before the accident, plaintiff's witnesses, Mr. and Mrs. Edmonds, had passed the truck, coming from the opposite direction, and had no difficulty in seeing it. After the accident, and when it had become good dark, there were a number of cars that passed the truck with plaintiff's car sitting partially to the left of it and taking up the greater part of the road. No one ran into either car and undoubtedly saw the cars a sufficient distance away to turn around them, although neither defendant's truck nor plaintiff's car had any lights on them after the accident.

After Mrs. Edmonds had passed plaintiff's car, and was looking back while her car was moving in the opposite direction, she could see the truck, and saw plaintiff's car run into it.

Plaintiff's car had good lights, and the testimony is that they were burning bright. He should have seen the truck, with his lights, long before he reached it, if he was traveling at the rate of twenty miles per hour, and in sufficient time to have turned out to the left and have avoided the truck, if he was going at thirty miles per hour.

There was no obstruction to prevent plaintiff from seeing the truck, if he had been keeping the proper lookout ahead and if his eyes were normal. Any normal man should have seen the truck at least 200 feet before he reached it, and the fact that plaintiff did not see the truck until within twenty feet of it lends strong support to the testimony of the three eye specialists that the plaintiff could see at twenty feet what a man with normal eyes could see at two hundred feet. His vision was either imperfect or he was not looking at the road ahead of him; either of which would bar his right to recover. The absence of a tail light from the truck was not the proximate cause of the accident; but the failure of the plaintiff to keep the proper lookout ahead was the cause of the accident.

The presumption of law is that one saw what he should have seen, and if his failure to see was because of defective vision or through failure to keep a proper lookout, he is not relieved from the consequences of his negligence.

If we should accept the view of the plaintiff that the contour of the road was such that he could not see the truck until within twenty feet of it, he would be no better off; for in that instance he would be guilty of violating the law of the road as set out in Act No. 296 of 1928, title II, section 5, paragraph (b), in that he was traveling at a greater rate of speed than fifteen miles per hour; and the principle of law repeatedly held by the courts of this state is, that when vision of the road ahead is obstructed, whether by curve or contour of the road, or anything else, it is the duty of a driver to bring his car down to such speed as to have it under such control that he can stop within the distance that he can see an obstruction.

Counsel for plaintiff have cited authorities holding that a person using the side-

walks or streets in an incorporated city has the right to presume that the highway or sidewalk is safe for ordinary travel and that he is not required to be on the lookout for extraordinary dangers or obstructions to which his attention has not been called.

The courts have also held that a blind man has the right to walk the streets of an incorporated city and to presume that the streets and sidewalks have no pitfalls in them for him caused by lack of repair. However, the law of the road is different, and a man who is blind or whose vision is bad is negligent if he attempts to drive a car on the road. Furthermore, it is reasonable for one to expect to find cars parked on the side of the road, cars without lights, due to lights burning out and broken down cars. It is no longer an unusual thing to see cars parked on the roadside, but it is unusual if you do not see many in traveling a great distance. It is no longer an extraordinary danger, not to be expected, but is an ordinary danger, to be expected; and the law of the road and the jurisprudence of this state require every person to keep a proper lookout ahead for such obstructions, and if one's failure to keep the proper lookout is the proximate or contributory cause of the accident, he cannot recover damages occasioned by said accident.

It is therefore ordered, adjudged and decreed that the judgment of the lower court be reversed and the demands of plaintiff be rejected at his cost.